IN THE

# United States Court of Appeals for the Eighth Circuit

STATE OF IOWA, *et al.*,

*Petitioners,*

— v. —

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

DISTRICT OF COLUMBIA, *et al.*

*Intervenors.*

On Petitions for Review of an Order
of the Securities and Exchange Commission

## FINAL BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT AND AFFIRMANCE

Donald L. R. Goodson
Bridget Pals
Erin Shortell
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3d Floor
New York, NY 10012
(212) 998-6193
donald.goodson@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

October 4, 2024

## RULE 26.1 DISCLOSURE STATEMENT

The Institute for Policy Integrity (Policy Integrity) is a nonpartisan, not-for-profit organization at New York University School of Law.[*] No publicly held entity owns an interest in Policy Integrity. Policy Integrity does not have any members who have issued shares or debt securities to the public.

---

[*] This brief does not purport to represent the views, if any, of New York University School of Law.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICUS CURIAE* ......................................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT .......................................................................................... 4

    I.     Petitioners Overstate The Rules' Costs While
          Understating Their Benefits. ............................................... 4

         A.    Proper analysis of a rule's effects considers only
               costs and benefits attributable to the rule, not
               baseline costs and benefits. .......................................... 4

         B.    Petitioners fail to acknowledge the effect of
               baseline practices on the Rules' costs. .......................... 6

             1.    Baseline disclosure practices greatly reduce
                     the costs attributable to the Rules. ...................... 7

             2.    Petitioners ignore baseline practices. ................. 13

             3.    Petitioners' other cost arguments fail. .............. 16

         C.    Petitioners understate the Rules' benefits. ................. 20

         D.    The SEC properly assessed the Rules' benefits. .......... 21

    II.    Petitioners Misuse Daniel Taylor's Event Study. ............... 24

         A.    Event studies have important limitations. ................. 25

         B.    The Taylor study used a small sample. ....................... 28

         C.    The Taylor study examined only a subset of
                climate-related disclosures. ........................................ 28

         D.    Petitioners largely ignore or misconstrue the more
                informative study the SEC cited. ................................ 29

         E.    The SEC did not need to point out the Taylor
                study's limitations. ..................................................... 31

CONCLUSION ..................................................................................... 33

CERTIFICATES OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Equity Inv. Life Ins. Co. v. SEC,*
  613 F.3d 166 (D.C. Cir. 2010)..............................................................5

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ............................................................................26

*Business Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011).............................................................5

*Chamber of Commerce v. SEC,*
  85 F.4th 760 (5th Cir. 2023)...................................................21, 24, 33

*Eagle Found., Inc. v. Dole,*
  813 F.2d 798 (7th Cir. 1987) ................................................................6

*Fed. Commc'n Comm'n v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................23

*In re Petrobas Securities,*
  862 F.3d 250 (2d Cir. 2017)................................................................28

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n,*
  720 F.3d 370 (D.C. Cir. 2010)............................................................24

*Menorah Medical Ctr. v. Heckler,*
  768 F.2d 292 (8th Cir. 1985) ........................................................31, 32

*St. James Hosp. v. Heckler,*
  760 F.2d 1460 (7th Cir. 1985) ............................................................32

**Regulations and Administrative Authority**

Exec. Order 14,094,
  88 Fed. Reg. 21879 (Apr. 11, 2023) ......................................................5

Off. of Mgmt. & Budget,
  Circular A-4: Regulatory Analysis (2023)..............................5, 6, 22, 23

Secs. & Exch. Comm'n, Comm'n Guidance Regarding Disclosure Related
  to Climate Change,
  75 Fed. Reg. 6,290 (Feb. 8, 2010). ......................................................13

Secs. & Exch. Comm'n, The Enhancement and Standardization of
Climate-Related Disclosures for Investors,
87 Fed. Reg. 21334 (proposed Apr. 11, 2022) ........................................1

Secs. & Exch. Comm'n, The Enhancement and Standardization of
Climate-Related Disclosures for Investors,
89 Fed. Reg. 21668 (Mar. 28, 2024) ........................................... *passim*

Secs. & Exch. Comm'n, Current Guidance on Economic Analysis in SEC
Rulemakings (Mar. 16, 2012)................................................. 5, 6, 22, 23

**Other Authorities**

Caroline Cecot & Robert W. Hahn, *Transparency in Agency Cost-Benefit
Analysis*,
72 Admin. L. Rev. 157 (2020) ..............................................................6

John Coates IV, *Cost-Benefit Analysis of Financial Regulation: Case
Studies and Implications*,
124 Yale L.J. 882 (2015).....................................................................22

Commission Delegated Regulation (EU) 2023/2772 of 31 July 2023
supplementing Directive 2013/34/EU of the European Parliament and
of the Council as regards sustainability reporting standards, 2023
O.J. (L 2772) .......................................................................................10

Jill E. Fisch et al., *The Logic and Limits of Event Studies in Securities
Fraud Litigation*,
96 Tx. L. Rev. 553 (2018).......................................................25, 27, 29

Paul A. Griffin et al., *The Relevance to Investors of Greenhouse Gas
Emission Disclosures*, 34 Contemp. Acct. Res. 1265 (2017)....28, 29, 30

## INTEREST OF *AMICUS CURIAE* & AUTHORITY TO FILE

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy.[1]

Policy Integrity submitted five comments on the proposed rules from the Securities and Exchange Commission (SEC) on The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21334 (proposed Apr. 11, 2022), App. 281–420. *E.g.*, Inst. for Pol'y Integrity, Comment Letter on Proposed Rule on The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 17, 2022), https://perma.cc/P8KE-75WL (addressing the proposed rules' economic analysis). Policy Integrity and its staff have also published reports and academic articles on climate-related financial risk. *E.g.*, Donald L. R. Goodson et al., Inst. for Pol'y Integrity, *The Continued Need for SEC Action on Climate-Related Disclosures* (2023),

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

https://perma.cc/GRB3-Y7TF. Policy Integrity draws on its expertise in administrative law and economics in this brief to address arguments regarding the SEC's economic analysis of its rules on The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21668 (Mar. 28, 2024) (Rules), App. 441–694.

All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

Petitioners contend that the Rules are too costly given the benefits they provide, but they overstate the Rules' costs while understating their benefits. Petitioners also argue that the SEC failed to respond to an event study that they say shows the Rules' benefits are nonexistent, but the study had critical limitations and was of little relevance. Neither set of economic arguments provides a basis for vacating the Rules.

**I.** Petitioners' economic analyses of the Rules' costs and benefits suffer from fundamental flaws. For starters, they ignore baseline disclosure practices—disclosures SEC registrants will provide regardless of the Rules. In fact, reading Petitioners' briefs, one would assume the SEC is requiring new and expensive disclosures heretofore unheard of in the corporate boardroom. Not so. If anything, the SEC is playing catchup:

Much of corporate America already provides or will soon provide climate-related disclosures, either voluntarily or to comply with mandatory disclosure laws in other jurisdictions. For many registrants, these baseline disclosure practices make the costs attributable to the Rules (often called incremental costs) far lower than they otherwise would be.

And, contrary to Petitioners' arguments, the Rules' benefits are significant. Although many registrants already provide climate-related disclosures, many others do not, and the registrants that do provide these disclosures often provide them in ways that are not consistent, comparable, or reliable. The Rules address these and other current problems, benefiting investors by providing them with more consistent, comparable, and reliable climate-related disclosures.

**II.** In an apparent effort to win on a technicality, Petitioners also criticize the SEC for not engaging with an event study from Daniel Taylor that, according to Petitioners, shows that climate-related disclosures are immaterial. But the SEC did engage with the study. Regardless, the study was of limited relevance and, as the study's own author explained, focused on only a subset of the Rules' requirements.

The Court should deny the petitions.

# ARGUMENT

## I. Petitioners Overstate The Rules' Costs While Understating Their Benefits.

Petitioners contend the Rules are too costly given the benefits they provide, but they overstate the Rules' costs and understate their benefits. When determining whether a rule is economically justified, agencies and courts assess only those costs and benefits attributable to the rule (i.e., incremental costs and benefits), not costs and benefits that would have materialized regardless (i.e., baseline costs and benefits). Petitioners ignore how baseline climate-related disclosure practices reduce the costs attributable to the Rules. And they downplay the Rules' benefits, namely, improved consistency, comparability, and reliability of climate-related disclosures across registrants.

### A. Proper analysis of a rule's effects considers only costs and benefits attributable to the rule, not baseline costs and benefits.

Under the Office of Management and Budget's Circular A-4, which synthesizes best practices for executive agencies' regulatory analyses, the key question agencies must ask when assessing their rules' costs and benefits is "how the state of the world in the regulation's presence would differ from the state of the world in its absence." Off. of Mgmt. & Budget,

Circular A-4: Regulatory Analysis 4 (2023), https://perma.cc/CH4U-LA5C [hereinafter Circular A-4].

Although Circular A-4 applies only to executive agencies, not to independent agencies like the SEC, *see id.* at 1; *see also* Exec. Order 14,094, 88 Fed. Reg. 21879, 21879 (Apr. 11, 2023), the SEC has adopted similar internal guidance, *see* Secs. & Exch. Comm'n, Current Guidance on Economic Analysis in SEC Rulemakings 4, 6–7 (Mar. 16, 2012) (citing Circular A-4 extensively) [hereinafter SEC Internal Guidance]. The SEC developed this internal guidance after several cases directed the SEC to use more robust economic analyses for its rules. *See, e.g., Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 178–79 (D.C. Cir. 2010); *Business Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011).

Under longstanding practice embodied in both Circular A-4 and the SEC Internal Guidance, an agency must first construct a "no-action baseline": a "forecast of the way the world would look absent the regulatory action being assessed, including any expected changes to current conditions over time." Circular A-4, *supra*, at 11. Baselines account for regulated entities' existing legal obligations and common voluntary practices, as well as "the likely paths of future government

programs and policies." *Id.* at 11–12, 54; *see also* SEC Internal Guidance, *supra*, at 6–7 & n.22.

The agency must then assess the rule's costs and benefits against that baseline to determine the costs and benefits attributable to the rule. Circular A-4, *supra*, at 11; *see also* Caroline Cecot & Robert W. Hahn, *Transparency in Agency Cost-Benefit Analysis*, 72 Admin. L. Rev. 157, 173 (2020). Or, as the Seventh Circuit explained, "[i]n any analysis of costs and benefits, the *incremental* costs and benefits of the decision under study are the sole concern." *Eagle Found., Inc. v. Dole*, 813 F.2d 798, 808 (7th Cir. 1987). Both Circular A-4 and the SEC Internal Guidance explain that the same baseline must apply to both costs and benefits. Circular A-4, *supra*, at 13; SEC Internal Guidance, *supra*, at 6, 8.

## B. Petitioners fail to acknowledge the effect of baseline practices on the Rules' costs.

Many registrants already provide at least some climate-related disclosures voluntarily; some also provide them, or will soon provide them, to comply with other legally binding disclosure regimes like the European Union's. These disclosure practices are part of the baseline against which the Rules' costs (and benefits) should be assessed. Yet

Petitioners' cost estimates and general discussion of costs ignore baseline disclosure practices and thus overstate the Rules' costs.

## 1. Baseline disclosure practices greatly reduce the costs attributable to the Rules.

Starting with baseline costs, as the SEC explained, many SEC registrants already comply or will soon comply with a variety of voluntary and mandatory climate-related disclosure regimes. App. 603–19 [89FR21830–46]. Given this baseline of existing disclosures, the Rules' costs are far lower than they might first appear.

To illustrate, consider three types of SEC registrants: (1) a company that provides voluntary climate-related disclosures; (2) a company that is or will be subject to another jurisdiction's climate-related disclosure framework; and (3) a company that does not provide voluntary climate-related disclosures (or provides very few) and is not subject to another jurisdiction's climate-related disclosure framework. Of course, not all registrants fit neatly into one of these buckets, and the sample companies provided below may not be fully representative of each bucket (each of which includes thousands of companies of diverse size and operating in diverse sectors). But they give the Court a more concrete understanding of some of the baseline disclosure practices that currently exist to

illustrate how those practices can reduce the costs attributable to the Rules.

Starting with the first bucket, many companies voluntarily provide climate-related disclosures, often using the Task Force on Climate-Related Disclosures (TCFD) framework (or some other framework) and often in corporate sustainability reports. The TCFD framework is a leading framework for climate-related disclosures and serves as a foundation for several disclosure regimes, including the Rules. *See, e.g.*, App. 446–47 & nn.46 & 52, 453–54, 606–07 [89FR21673–74,21680–81,21833–34].

Take Target, for example. *See* Target, *2023 Sustainability and Governance Report* 10, 51 (2023), https://perma.cc/JJ94-2E6U [hereinafter 2023 Target Report]. Among other things, Target's voluntary disclosures include its greenhouse gas (GHG) emissions, divided among Scopes 1 (onsite emissions), 2 (emissions from purchased energy), and 3 (emissions from its value chain). *Id.* at 14; *see also* App. 447 n.67, 500 [89FR21674,21727]. Target also discloses certain information about its climate-related goals and progress, 2023 Target Report, *supra*, at 11, risk management and strategy, *id.* at 17, and governance structures, *id.* at 9.

While Target may not voluntarily disclose everything the Rules require, the costs that Target faces *as a result of* the Rules are a fraction of what they would be if Target did not already voluntarily disclose so much of this information. This point applies to both initial set-up costs (which companies like Target may not face, because they have already built necessary disclosure infrastructure) and ongoing costs (as one would expect these companies to continue voluntarily providing climate-related disclosures, regardless of the Rules).

At least one survey suggests that over half of current SEC registrants may be similar to Target in that they already provide corporate sustainability reports, which typically include climate-related information. App. 614 [89FR21841]. In fact, a 2022 analysis found that 90% of companies in the Russell 1000 Index and 98% of companies in the top half of that index ("which roughly comprises the S&P 500 Index") publish corporate sustainability reports, App. 615 [89FR21842], meaning many companies likely already disclose at least some climate-related information.

Next, consider Microsoft. Microsoft operates globally and will likely be subject to the European Union (EU) climate-related disclosures

framework. *See* App. 607–08 [89FR21834–35]; Form 10-K for Microsoft Corp. 30–32, 58 (2023), https://microsoft.gcs-web.com/static-files/e2931fdb-9823-4130-b2a8-f6b8db0b15a9. Roughly 3,700 SEC registrants (about 40% of all registrants[2]) may also be subject to the EU framework.[3] App. 608 [89FR21835].

The EU framework, which is TCFD-aligned, App. 607 [89FR21834], is similar to the SEC's Rules but more demanding in many respects. For example, the EU mandates disclosure of all GHG emissions, including Scope 3 emissions, while the SEC requires disclosure of only Scope 1 and 2 emissions and only if material. *Compare* Commission Delegated Regulation (EU) 2023/2772 of 31 July 2023 supplementing Directive 2013/34/EU of the European Parliament and of the Council as regards sustainability reporting standards, 2023 O.J. (L 2772) 80, https://perma.cc/YEC8-CSSM, *with* App. 689 [89FR21916] (Item 1505).

---

[2] To ascertain the total number of companies potentially subject to the Rules, the SEC adds together the total number of companies that filed a unique Form 10-K or Form 20-F in 2022 (8,292 + 729 = 9,021). App. 677 n.1 [89FR21904].

[3] Like Target, Microsoft and many of these other registrants also already voluntarily provide TCFD-aligned disclosures. *See, e.g.*, Microsoft, *2024 Environmental Sustainability Report* 85 (2024), https://perma.cc/8TBK-CWMX.

For Microsoft (and the 3,700 other SEC registrants likely to be subject to the EU framework, App. 608 [89FR21835]), the incremental costs attributable to the Rules are thus a fraction of the costs for registrants that do not currently provide climate-related disclosures and will not be subject to the EU framework. Microsoft and others like it will thus incur the costs of collecting and disclosing climate-related information to comply with the EU framework, regardless of the Rules.

And the EU is not alone. Many other jurisdictions have adopted, or plan to adopt, their own mandatory climate-related disclosure frameworks (for example, the United Kingdom and Canada), which could also affect SEC registrants. App. 454, 606–07 [89FR21681,21833–34]. Likewise, some states now require insurers—including SEC registrants—to provide TCFD-aligned disclosures to the National Association of Insurance Commissioners. App. 605 [89FR21832] (96 SEC registrants in 2022). And before the SEC issued its Rules, California enacted two laws that will require all companies doing business in California above a revenue threshold—an estimated 2,520 SEC registrants—to provide climate-related disclosures. App. 606 [89FR21833].

Finally, consider Petitioner Liberty Energy. Liberty Energy does not appear to provide extensive TCFD-aligned disclosures (perhaps unsurprising given its vociferous opposition to the Rules). And Liberty Energy filed a declaration in related litigation expressly stating that it is not subject to the EU's (or California's) climate-related disclosure requirements. Michael Stock Decl. ¶ 4, https://perma.cc/7BAS-YLBV; *see, e.g.*, Liberty Energy Br. 9 & n.2 (cross-referencing declaration). The Rules may thus affect Liberty Energy more than many other companies. (As an aside, however, even Liberty Energy provides at least some climate-related disclosures: In a recent report, Liberty Energy provided "Sustainability Accounting Standards Board (SASB)" disclosures—including Scope 1 GHG emissions calculated in accordance with the Greenhouse Gas Protocol. Liberty Energy, *Bettering Human Lives* 176 (2024), https://perma.cc/VV8N-2R9K.)

But even a company that does not currently provide or plan to provide separate climate-related disclosures could not necessarily attribute all costs of future disclosures to the Rules, given the existing fabric of non-climate-related disclosure requirements. Most notably, existing securities regulations already require companies to disclose

certain material climate-related information. *See* Comm'n Guidance Regarding Disclosure Related to Climate Change, 75 Fed. Reg. 6,290, 6,295–97 (Feb. 8, 2010).

In short, many SEC registrants already provide climate-related disclosures or will soon be required to do so regardless of the Rules. As discussed above, *see* Part I.A, *supra*, proper economic analysis examines only those costs and benefits attributable to the Rules, not costs and benefits that would occur regardless of the Rules.

### 2. Petitioners ignore baseline practices.

To argue that the Rules' costs are excessive, Petitioners point to billion-dollar aggregate cost estimates. In addition to varying wildly from Petitioner to Petitioner, those estimates do not reflect baseline disclosure practices, meaning they overstate the Rules' incremental costs.

In its economic analysis, the SEC estimated that the per-registrant annual compliance costs under the Rules "could range from less than $197,000 to $739,000." App. 648 [89FR21875]. Where in that range a given registrant falls depends on which disclosures that registrant would need to provide that year. At the low end of the range would be a registrant that "does not conduct scenario analysis, does not have

material Scope 1 and 2 emissions, has no climate-related target or goal, and has no applicable expenditures or financial statement impacts that require disclosure." App. 648 [89FR21875]. At the high end, "there may be other registrants for which all estimated compliance costs apply." App. 648 [89FR21875].

Critically, while the SEC pointed out that current disclosure practices inform the Rules' baseline, App. 604 n.2581 [89FR21831], the SEC did not reduce its estimated per-registrant cost range because of these practices, App. 648 [89FR21875]. The SEC instead "assume[d] registrants have no pre-existing climate-related disclosure practices" to ensure a conservative approach to estimating the Rules' costs. App. 649 [89FR21876] (explaining that, in addition to assuming no baseline disclosure practices, "[w]herever possible, assumptions that tend to overstate actual costs were chosen over those that would tend to understate them"). As the SEC noted, "[i]ncremental compliance costs would be even lower for registrants that already provide these disclosures (either voluntarily or as required by other laws or jurisdictions)." App. 648 [89FR21875]. Far from "cook[ing] its own books" to provide indefensibly low cost estimates, Chamber Br. 17, the SEC went out of its

way to overestimate, rather than underestimate, quantified per-registrant costs.

The SEC then used the per-registrant compliance cost estimates from its economic analysis to prepare the aggregate cost estimates in the Rules' Paperwork Reduction Act (PRA) analysis. App. 668 [89FR21895] ("Our estimates of the paperwork burden associated with the final rules are based on the direct cost estimates discussed in the Economic Analysis."). Like the compliance cost estimates in the economic analysis, the aggregate cost estimates in the PRA Analysis assume no baseline disclosure practices. *Compare* App. 648 [89FR21875] (stating the SEC's per-registrant compliance cost estimates for the Rules' various provisions and noting these estimates do not reflect baseline disclosure practices), *with* App. 670 tbl.3 [89FR21897] (using the same compliance cost estimates as inputs). The SEC even reiterated that these compliance cost estimates "likely represent an upper bound of the paperwork burden of the final rules as they reflect a conservative approach (i.e., erring on the side of overstating costs rather than understating them)." App. 668 [89FR21895].

Using that conservative approach, the SEC calculated aggregate costs across all (roughly 9,000, App. 677 n.1 [89FR21904]) registrants of around $2.3 billion annually. App. 681 [89FR21908].[4] This estimate is the same as the Chamber's, Chamber Br. 3, but far lower than Liberty Energy's ($4.1 billion per year), Liberty Energy Br. 12, 14, 46. (Other Petitioners cite different or vague estimates that are hard to pin down. Nat'l Legal Pol'y Ctr. Br. 37 ($1.8 billion annually); State of Iowa et al. Br. 15, 36–37 ("billions of dollars" per year).)

As the Rules emphasize but Petitioners ignore, in reality, the incremental costs attributable to the Rules will almost certainly be much lower because of registrants' baseline disclosure practices.

### 3.  Petitioners' other cost arguments fail.

Petitioners' arguments that the SEC intentionally understated its cost estimates, *e.g.*, Chamber Br. 3, 37; Liberty Energy Br. 46, also fail. As explained just above, if anything, the SEC overstated the Rules' costs.

---

[4] The "Program Change" section of PRA Table 7 estimates the Rules' aggregate internal and external costs, with the external costs in dollars and the internal costs in hours. To monetize the internal costs, the figure in Table 7 is multiplied by the wage rate for internal costs ($441/hour, App. 669 [89FR21896]).

First, Petitioners attack the SEC for relying on cost estimates that they malign as biased. Chamber Br. 39. Oddly, one of these estimates comes from S&P Global—hardly a "nonprofit environmental group[]." *Compare id.*, *with* App. 652–53 [89FR21879–80]. And the SEC considered both industry and survey data to arrive at its own cost estimates. *See, e.g.*, App. 644–47, 652 [89FR21871–74,21879].

Petitioners also suggest a particular survey (the ERM survey) is biased, Chamber Br. 40, but that survey examined a diverse cross-section of companies, App. 645 & nn.2988–89 [89FR21872]. Petitioners further contend the survey artificially deflated response values and thus made the Rules' costs appear too low. Chamber Br. 40–41. This argument misses the mark. For starters, the SEC cited the ERM survey in only three estimates: (1) the costs of GHG emissions disclosures, App. 652 tbl.10 [89FR21879]; (2) the costs of assurance for GHG emissions disclosures, App. 655 tbl.12 & n.15 [89FR21882]; and (3) the costs associated with scenario analysis, App. 656 tbl.13 [89FR21883].

But here's the kicker: In all instances, the ERM survey estimates were *among the highest*, and so the ERM survey's inclusion would not have lowered the overall median estimates, as Petitioners imply. App.

652 tbl.10 [89FR21879] (third highest of eight); App. 655 tbl.12 & n.15 [89FR21882] (fifth highest of seventeen); App. 656 tbl.13 [89FR21883] (highest of four). Being at the high end of the range, the ERM survey estimates could only *increase* the median value. If the SEC had instead excluded the ERM survey, it would have found lower median cost estimates: $75,000 (instead of $79,236) for GHG emissions disclosures, *see* App. 652 & tbl.10 [89FR21879], $47,500 (instead of $50,000) for assurance, *see* App. 655 tbl.12 & n.15 [89FR21882], and $40,688 (instead of $60,197) for scenario analysis, *see* App. 656 & tbl.13 [89FR21883].

Second, Petitioners state that the costs of assessing the materiality of GHG emissions disclosures "affect[] *every* public company." Chamber Br. 41–42. But the GHG emissions disclosure requirements apply only to large registrants (based on market value) that have experience with the SEC's reporting requirements. App. 689 [89FR21916] (Item 1505 applies only to "large accelerated filer[s]" and "accelerated filer[s]," excluding "smaller reporting compan[ies]" and "emerging growth compan[ies]"). The SEC limited the GHG emissions disclosure requirements to these registrants precisely because it recognized they could more easily bear the associated costs given their larger size and reporting experience. App.

509 [89FR21736]. Moreover, an SEC analysis of a sample of 5,535 registrants found that, as of 2021,[5] 50% of large accelerated filers and 17% of accelerated filers already report Scope 1 and Scope 2 emissions in their annual filings, sustainability reports, or other public disclosures. App. 615–16 & tbl.5 [89FR21842–43]. (As noted above, Liberty Energy itself already discloses its Scope 1 emissions in a public report.)

Third, Petitioners argue the SEC deflated its aggregate cost estimates in the PRA analysis by excluding initial preparation costs in the years before implementation of the GHG emissions disclosure requirements. Liberty Energy Br. 46–47 (citing App. 672 & tbl.4A, 673 & tbl.4B [89FR21899,21900]). This is incorrect. The SEC included initial start-up costs for GHG emissions disclosures (and all other disclosure categories) in its cost estimates. *Compare* App. 670 tbl.3 [89FR21897] (columns (A)–(E)), *with* App. 672 tbl.4A, 673 tbl.4B [89FR21899,21900] (including additional burden-hours and costs in Year 2 for large accelerated filers and in Year 3 for accelerated filers as compared to subsequent years, reflecting estimated preparatory costs); *see also* SEC Br. 88.

---

[5] Data for 2022 is likely incomplete. App. 616 n.2677[89FR21843].

### C.    Petitioners understate the Rules' benefits.

What's more, Petitioners understate the Rules' benefits. To be sure, just as baseline disclosure practices reduce the Rules' incremental costs, *see* Part I.B.1, *supra*, they also reduce the Rules' incremental benefits. But, as the SEC explained in the Rules, the Rules still provide something new and decision-useful for investors: Namely, they make climate-related disclosures—some of which, Petitioners correctly note, SEC registrants must provide already—more consistent, comparable, and reliable. App. 622 [89FR21849].

As for consistency and comparability, not all registrants currently provide climate-related disclosures. The Rules will better ensure that all registrants disclose material climate-related information in a standardized manner, helping investors better compare previously disclosing and non-disclosing registrants. App. 622 [89FR21849]. And although many registrants already disclose climate-related information—whether under a voluntary disclosure framework, another legally-binding disclosure regime, or the SEC's pre-existing regulations and guidance—the location and type of these disclosures varies. App. 622 [89FR21849]. The Rules will promote standardization among these

disclosures, reducing investor search costs. *See* App. 603, 621–22 [89FR21830,21848–49]. These investor search costs are non-trivial; one commenter explained that it spends millions of dollars a year analyzing publicly-available—but non-standardized—climate-related information. *See, e.g.*, App. 623 & n.2754 [89FR21850]; App. 443 [89FR21670].

In addition, the Rules will improve these disclosures' reliability, even for registrants that previously disclosed climate-related information outside of their SEC filings. As the SEC noted, "these disclosures will be subject to potential liability under the Exchange Act and the Securities Act, which will incentivize registrants to take additional care to ensure the accuracy of the disclosures." App. 622 [89FR 21849]. As a result, the Rules will "improve investor confidence in the accuracy and completeness of such disclosures." App. 622 [89FR21849].

### D.  The SEC properly assessed the Rules' benefits.

Contrary to the Business Roundtable's *amicus* brief, Business Roundtable Br. 25, the case law is clear: There is no legal requirement for the SEC to quantify the costs and benefits of its rules—even if it is feasible to do so. *Chamber of Commerce v. SEC*, 85 F.4th 760, 772–73 (5th Cir. 2023). Of course, best economic practice counsels that agencies

*should* quantify costs and benefits when reasonably feasible. *E.g.*, SEC

Internal Guidance, *supra*, at 13–14. But both Circular A-4 and the SEC

Internal Guidance direct agencies to *qualitatively* analyze costs and

benefits that are hard to quantify. *See id.*; Circular A-4, *supra*, at 2, 44–

46. Circular A-4 specifies that, if costs and benefits are "difficult to

quantify"—for example, because of the "difficulty in collecting the

relevant data" or the "expenditure of the time or resources needed to

measure the benefit or cost in the specific regulatory context"—the

agency may qualitatively assess them. Circular A-4, *supra*, at 44–46.

And as the SEC Internal Guidance points out, "the difficulty of

reliably estimating the costs of regulations to the financial services

industry and the nation has long been recognized, and the benefits of

regulation generally are regarded as even more difficult to measure."

SEC Internal Guidance, *supra*, at 10 (citing GAO Report No. 12-151 at

19). Others have similarly explained how and why quantifying the costs

and benefits of financial regulations may be especially challenging. *See,*

*e.g.*, John Coates IV, *Cost-Benefit Analysis of Financial Regulation: Case*

*Studies and Implications*, 124 Yale L.J. 882, 894–95, 999–1003 (2015).

Given this reality, and consistent with Circular A-4, when SEC staff

determine that "costs or benefits cannot reasonably be quantified," the SEC Internal Guidance directs them to explain why and provide a qualitative assessment instead. SEC Internal Guidance, *supra*, at 13–14; Circular A-4, *supra*, at 44–46.

That is exactly what the SEC did here. The SEC explained that it could not reliably quantify the Rules' benefits because it "lack[ed] information necessary to provide a reasonable estimate." App. 602 [89FR21829]. For example, the SEC noted that "existing empirical evidence does not allow us to reliably quantify how enhancements in climate-related disclosure may improve information-processing by investors." App. 602–03 [89FR21829–30]. The SEC then qualitatively assessed the Rules' various benefits, *see* App. 621–23 [89FR21848–50], and concluded overall that the Final Rules' "burdens [on registrants] are justified by the informational benefits of the disclosures to investors," App. 444 [89FR21671].

The SEC's handling of these unquantifiable benefits comports with Circular A-4, its own internal guidance, and case law. *See* Circular A-4 at 2, 44–46; SEC Internal Guidance at 13–14; *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009); *Chamber of*

*Commerce*, 85 F.4th at 772–73; *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2010) (rejecting petitioners' argument that the agency needed to "put a precise number on the benefit of data collection in preventing future financial crises" because the benefit is "immeasurable").

\* \* \*

A proper assessment of the Rules' costs and benefits requires acknowledging that baseline disclosure practices greatly reduce the costs attributable to the Rules. Petitioners' failure to acknowledge these practices undermines their criticisms of the Rules' costs. Petitioners also fail to recognize the incremental benefits of the Rules, which the SEC appropriately assessed.

## II.   Petitioners Misuse Daniel Taylor's Event Study.

Petitioners also argue that the SEC improperly ignored Daniel Taylor's event study, which did not find highly unusual market activity after 35 selected GHG emissions disclosures. Chamber Br. 10–11, 29–31. According to Petitioners, Taylor's study demonstrates that climate-related disclosures are immaterial. *Id.* As the SEC explains, it did respond to Taylor's study. SEC Br. 71–72. In any event, the SEC didn't

need to respond to the Taylor study, which Petitioners oversell and misunderstand. Most notably, an event study like Taylor's does not provide conclusive evidence of non-materiality. The Taylor study was also not from a peer-reviewed publication (and to *amicus curiae*'s knowledge, has not been subject to peer review), and it used a small sample, further limiting its ability to test the importance of GHG emissions disclosures. Finally, the Taylor study focused exclusively on GHG emissions disclosures, not climate risk disclosures writ large—as Taylor himself explained. The SEC did not need to point out these limitations to avoid vacatur.

## A. Event studies have important limitations.

An event study examines whether a stock price or trading volume changed significantly in response to a given event (here, a disclosure). Jill E. Fisch et al., *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tx. L. Rev. 553, 555 (2018). If the study properly controlled for other variables (such as news affecting the company's industry or the broader economy) and the stock price or trading volume changed significantly right after the disclosure, then the price or volume movement may suggest that the disclosure was material. In other words,

the change in stock price or trading volume may indicate that a reasonable investor would consider the information important in making an investment decision. But just because a stock price or trading volume does not change significantly in response to a disclosure does not mean the disclosure is *im*material. Most notably, if the market already expected the information, the stock price would already reflect it.[6]

Consider a car company like Ford. If analysts predict that Ford will soon report that it sold 100,000 cars last quarter, and Ford announces it actually sold 110,000 cars, Ford's announcement may move its stock price because car sales were higher than predicted. In contrast, if Ford reported that it actually sold 100,000 cars last quarter, its stock price may not change because the estimate aligns with analysts' predictions. But that lack of price movement does not indicate that the market views Ford's car sales as useless information.

Other factors could also explain a lack of price or volume movement even if the disclosed information is material, including that "noise"

---

[6] The efficient-market hypothesis undergirding modern securities laws assumes that publicly available information is reflected in a company's stock price. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 246 & n.24 (1988).

surrounding the disclosure cancelled it out. If Ford delivered 90,000 cars but reported higher profit margins on those fewer cars, the good and the bad news could cancel each other out. Likewise, a study may find a lack of price or volume movement because the information is not disclosed in a useful or clear way. Again, none of this means Ford's car sales are immaterial.

Furthermore, an event study answers only whether the stock price or trading volume movement "was highly unusual"—most commonly defined as whether the movement was "among the 5% most extreme values one would expect to observe" due to chance alone (i.e., whether it was statistically significant at the 5% level)—on the date of or immediately after a disclosure. *See* Fisch et al., *supra*, at 574–75. A finding that the price or volume impact *wasn't* highly unusual doesn't mean the disclosure had *no* price or volume impact. *See id.* at 613.[7] And all the Taylor study found was a lack of highly unusual price or volume

_____

[7] Event studies are often used in securities litigation to show materiality, reliance, loss causation, and damages. Fisch et al., *supra*, at 555. But scholars have shown that "characteristics of real world disclosures may limit the ability of an event study to determine the relationship between a specific disclosure and stock price," noting that "[t]hese concerns have not received sufficient attention by the courts that are using event studies to decide securities [fraud] cases." *Id.* at 613.

movement around the GHG emissions disclosures in the study. App. 1063 [3381CL6].

## B. The Taylor study used a small sample.

In addition, the Taylor study used a small sample of just 35 Form 8-Ks (forms typically used to inform investors of significant events). App. 1062 [3381CL5]. For comparison, the peer-reviewed event study the SEC cited, which did find highly unusual stock price movement around GHG emissions disclosures, had a sample of 1,964 Form 8-Ks. App. 614 n.2660 [89FR21841]; Paul A. Griffin et al., *The Relevance to Investors of Greenhouse Gas Emission Disclosures*, 34 Contemp. Acct. Res. 1265, 1268 (2017). "[S]mall sample sizes," like the Taylor study's, "may limit statistical power, meaning that only very large-impact events will be detectable." *In re Petrobas Securities*, 862 F.3d 250, 278–79 (2d Cir. 2017).

## C. The Taylor study examined only a subset of climate-related disclosures.

Moreover, Petitioners incorrectly depict the Taylor study as "examin[ing] the market reaction to corporate disclosures of climate-related information." Chamber Br. 29. The Taylor study concerns only GHG emissions disclosures, a small subset of the Rules' disclosure

requirements. Taylor himself emphasized this distinction: "I caution that this evidence does _not_ suggest climate risk is immaterial, but rather it suggests [at most] that GHG emissions are not material." App. 1063 [3381CL6] (emphasis Taylor's). The Taylor study thus did not assess the need for the bulk of the Rules.

### D.    Petitioners largely ignore or misconstrue the more informative study the SEC cited.

Petitioners also ignore the event study the SEC _did_ cite—a peer-reviewed, multi-part study that included an event study of 1,964 Form 8-Ks (the Griffin study). The Griffin event study found "a distinct increase in stock price volatility around the day of an 8-K emission filing, consistent with investors' use of 8-K emission information." Griffin et al., _supra_, at 1268.

In addition, the Griffin study also found statistically significant results at the 1% significance level, _id._ at 1287–88, meaning the Griffin study detected highly unusual stock price movements even when defining "highly unusual" more strictly (requiring results among the 1%, rather than the 5%, "most extreme values one would expect to observe" due to chance alone, _see_ Fisch et al., _supra_, at 574–75).

Even as Petitioners ignore the more informative Griffin *event* study, they use another component of this multi-part study to argue that the Rules are unnecessary because "sufficient information is already at investors' fingertips." Chamber Br. 25–26. Petitioners point to GHG emissions as an example of already-available climate-related information. They assert that this separate (non-event-study) component of the Griffin study "finds *no evidence of a difference in valuation* between GHG emissions voluntarily disclosed by the company *and the valuation of GHG emissions inferred from publicly-observable information*." Chamber Br. 26 (quoting App. 1064 [3381CL7] (describing the Griffin study)) (emphasis Chamber's). So, Petitioners assert, "if the SEC's true objective were to provide investors with material climate-related information, this rule would not be needed" because investors can simply infer companies' GHG emissions. *Id.*

But Petitioners miss a crucial detail: The Griffin study applies complex modeling techniques to estimate non-disclosing companies' GHG emissions based on "scale of operations, investment, asset composition, sector, and other key financial data." *See* Griffin et al., *supra*, at 1267–68, 1272–73. Far from being "at investors' fingertips," Chamber Br. 25–

26, the methods the Griffin study uses to estimate undisclosed GHG emissions would make many investors' heads spin. The Rules aim to reduce these costs that investors might otherwise incur. *See* App. 622 [89FR21849].

### E. The SEC did not need to point out the Taylor study's limitations.

Arguing it was arbitrary for the SEC not to consider the Taylor study, Chamber Br. 30–31, Petitioners cite *Menorah Medical Center v. Heckler*, 768 F.2d 292, 295–96 (8th Cir. 1985). As noted above, the SEC engaged with Taylor's study. *See* SEC Br. 71–72. And in any event, *Menorah Medical* is clearly distinguishable from this case. Unlike in *Menorah Medical*, for the reasons given above, the Taylor study does not "cast serious doubt" on the SEC's conclusion that climate-related information is often material to investors. *Menorah Medical*, 768 F.2d at 295–96.

In *Menorah Medical*, the Department of Health and Human Services (HHS) decided to change how Medicare reimbursed malpractice premiums. *Id.* at 294. HHS relied entirely on a single, faulty study to conclude that existing regulations "result[ed] in Medicare paying a disproportionate amount of malpractice costs" and that the rule was

therefore needed. *Id.* (citation omitted). Although the study "came under significant criticism" during the rule's comment period, HHS failed to respond to those criticisms and relied exclusively on that one study to issue its final rule. *Id.* at 295–96. This Court held that "[s]ince these criticisms cast serious doubt on the premise grounding the [agency's] explanation, [its] failure to respond to them was arbitrary and capricious." *Id.*; *see also St. James Hosp. v. Heckler*, 760 F.2d 1460, 1466–68 (7th Cir. 1985).

Far from relying on one flawed study as the HHS did in *Menorah Medical*, the SEC relied on a peer-reviewed event study with a larger sample than the Taylor study's, in addition to several other peer-reviewed studies. *See, e.g.*, App. 614 [89FR21841] ("We decline to follow [Chamber's] suggestion [that the SEC conduct an event study] in light of the support in peer reviewed literature for the importance of climate-related disclosure to investors."); App. 621–22 [89FR21848–49] (citing other studies on the importance of climate-related information to investors).

Given the weight of the evidence the SEC explicitly considered, the SEC did not need to respond to the small and limited Taylor study.

*Chamber of Commerce*, 85 F.4th at 774 ("Comments the agency must respond to include those that can be thought to challenge a fundamental premise underlying the proposed agency decision or include points that if true and adopted would require a change in an agency's proposed rule.") (internal quotation omitted).

## CONCLUSION

For the foregoing reasons, this Court should deny the petitions for review.

October 4, 2024

Respectfully submitted,

*/s/* Donald L. R. Goodson
Donald L. R. Goodson
Bridget Pals
Erin Shortell
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3d Floor
New York, NY 10012
(212) 998-6193
donald.goodson@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

# CERTIFICATE OF COMPLIANCE

I certify that this *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because this brief contains 6,147 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

I further certify that this *amicus curiae* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

DATED:   October 4, 2024        Respectfully submitted,

/s/ Donald L. R. Goodson
Donald L. R. Goodson

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

# EIGHTH CIRCUIT RULE 28A(h)(2) CERTIFICATION

I certify that this brief has been scanned for viruses and is virus-free.

DATED:    October 4, 2024

Respectfully submitted,

/s/ Donald L. R. Goodson
Donald L. R. Goodson

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

**CERTIFICATE OF SERVICE**

I certify that on this 4th day of October 2024, a true and correct copy of the foregoing Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Support of Respondent and Affirmance was filed with the Clerk of the United States Court of Appeals for the Eighth Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

This brief is identical to the brief that Policy Integrity filed with the Court on August 15, 2024, with the exception that placeholder citations for the deferred joint appendix have been replaced with joint appendix citations. Policy Integrity did not receive the joint appendix until October 1, 2024.

DATED:   October 4, 2024          Respectfully submitted,

/s/ Donald L. R. Goodson
Donald L. R. Goodson

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*